# UNITED STATES DISTRICT COURT

for the

Western District of Washington

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.    MJ21-181 |
| Subject Premises described in Attachments A-1 and A-2: | ) | |
| 1) Business premises located at 14212 Ambaum Blvd. SW, Suites 302 & 304, Burien, WA 98166, as further described in Attachment A-1; and | ) ) | |
| 2) Residence located at 1865 SW Miller Creek Rd., Burien, WA 98166, as further described in Attachment A-2 | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachments A-1 and A-2, incorporated herein by reference.

located in the _____Western_____ District of _____Washington_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachments B-1 and B-2, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 26 U.S.C. § 7206(1) | Filing False Tax Returns |

The application is based on these facts:

✓ See Affidavit of Special Agent Bryan Azer continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

---

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

*Applicant's signature*

Bryan Azer, Special Agent, IRS-CID

*Printed name and title*

◯ The foregoing affidavit was sworn to before me and signed in my presence, or

◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date  March 30, 2021

*Judge's signature*

City and state:   Seattle, Washington

Mary Alice Theiler, United States Magistrate Judge

*Printed name and title*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**AFFIDAVIT**

STATE OF WASHINGTON )

                                 ) ss

COUNTY OF KING )

      I, BRYAN AZER, having been duly sworn, hereby state as follows:

**I.     INTRODUCTION**

      1.      This affidavit is made in support of an application for warrants to search two locations (one business and one residence) for evidence of violations of Title 26, United States Code Section 7206(1) (Filing of a False Tax Return).  In sum, this investigation has revealed that probable cause exists to believe the target of this investigation diverted business gross receipts and excluded those receipts from the target's business tax returns and the target's personal tax returns.

      2.      This affidavit is submitted in support of a warrant to search the following locations:

- The business office of Adult and Pediatric Medicine / Kristine Brecht M.D. ("APM") and the business office of Aesthetic Rejuvenation Spa ("ARS"), located at 14212 Ambaum Blvd. SW, Suite 302 and Suite 304, Burien, WA 98166-1437 (the "BUSINESS PREMISES"), as further described in Attachment A-1, for items described in Attachment B-1; and

- The residence of Kristine Brecht, located at 1865 SW Miller Creek Rd, Burien, WA 98166 (the "RESIDENCE PREMISES"), as further described in Attachment A-2, for items described in Attachment B-2.

**II.    EXPERIENCE OF AGENT**

      3.      I am a Special Agent employed by the Internal Revenue Service, Criminal Investigation (IRS-CI) in Seattle, Washington.  I have been so employed since August 2017.  My official duties and responsibilities include the investigation of alleged criminal violations of the Internal Revenue laws and related offenses (Title 26, United States Code).  I have been the affiant or added IRS-CI allegations to several different warrants.

AFFIDAVIT OF SPECIAL AGENT BRYAN AZER - 1
USAO #2020R00113

1  I have also participated in the execution of numerous search warrants sought by and

2  issued to other special agents of IRS-CI, HSI, ATF, and FBI.  I have worked with federal,

3  state, and local law enforcement agencies across numerous investigations of suspected

4  tax fraud, money laundering, and other related federal criminal laws.

5        4.        I received a Bachelor of Fine Arts degree in Accounting from the

6  University of Washington in 2010.  After graduating, I worked full time as a Revenue

7  Auditor with the State of Washington Department of Revenue, performing tax audits of

8  local and out of state multi-national corporations.  In November 2017, I graduated from

9  the Criminal Investigator Training Program at the Federal Law Enforcement Training

10  Center in Glynco, Georgia. In February 2018, I graduated from the Special Agent

11  Investigative Techniques program at the National Criminal Investigation Training

12  Academy in Glynco, Georgia.  The special agent training included courses in law

13  enforcement techniques, federal criminal statutes, conducting criminal investigations and

14  the execution of search warrants.  The training also included accounting and financial

15  investigative techniques, and specific procedures, policies and laws as applicable to the

16  Internal Revenue Service and financial criminal investigations.

17        5.        Facts in this affidavit are based upon various sources, including, but not

18  limited to: interviews of witnesses, bank records, private insurance company records, my

19  conversations with other law enforcement officers (and review of law enforcement

20  reports) and other government employees who have participated in this investigation.

21  Because this affidavit is submitted for the limited purpose of establishing probable cause

22  in support of an application for a search warrant, it does not include each and every fact

23  known to me concerning this investigation.  I have set forth only those facts that I believe

24  are relevant to the determination of probable cause to support the issuance of the

25  requested warrant.

26  **III.    RELEVANT INDIVIDUALS AND ENTITIES**

27        6.        Kristine Brecht (Brecht) is a medical doctor – a family medicine specialist,

28  and plastic surgeon.  Brecht owns Aesthetic Rejuvenation Spa, PLLC (ARS) and Adult

and Pediatric Medicine of Burien LLC (APM).  Both ARS an APM are located at the BUSINESS PREMISES.  According to an online review, Brecht is a board-certified physician licensed to practice in the state of Washington, with a specialty in plastic surgery, dermatology and aesthetics.  Brecht obtained her physician certification from the University of Massachusetts and then completed her plastic surgery fellowship from the University of South Florida in 2002. Brecht currently maintains a DEA registration which is required for ordering, prescribing, administering, and/or dispensing controlled substances.  Brecht has made speeches on the topic of aesthetics, incuding speaking at The World Congress of Liposuction.  Brecht has held numerous trainings over her professional career such as "Cosmetic Surgeons friends and myself doing a Figurative Sculpture Training,"  Brecht has appeared on television and talk shows such as King 5 News, New Day Northwest, iheart Radio to discuss plastic surgery, and she has posted numerous videos to her business website.

7.      According to county property records and surveillance conducted in this investigation, Brecht resides at the RESIDENCE PREMISES.

8.      According to the Washington State Department of Revenue (WA-DOR), Aesthetic Rejuvenation Spa, PLLC (ARS) is a Professional Limited Liability Company formed in the state of Washington, governed by Brecht.  The NAICS code listed on WA-DOR for ARS is offices of physicians excluding mental health specialists.  The locations officially registered with WA-DOR are a street address in Normandy Park, WA (a former personal residence for Brecht) and 14212 Ambaum BLVD SW, STE 304, Burien, WA 98166 (within the BUSINESS PREMISES).  The website for ARS indicates that ARS performs a variety of plastic surgery procedures to include: arm lifts, full body lifts, body sculpting, breast augmentation, liposuction, and others.  ARS advertises that they also provide other non-surgical procedures such as acne treatments, scar removals, spider veins, skin revisions, botox, medical spas, and others.

9.      According to the WA-DOR, Adult and Pediatric Medicine, LLC (APM) is a limited liability company formed in the state of Washington, and governed by Brecht.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

The NAICS code listed on WA-DOR for APM is offices of physicians, excluding mental health specialists. The location officially registered with WA-DOR is 14212 Ambaum Blvd SW, Ste 304, Burien, WA 98166 (within the BUSINESS PREMISES). No online website could be located for APM.

10. APM and ARS share the BUSINESS PREMISES as office space. The front door of Suite 304 lists "Aesthetic Rejuvenation," "Kristine Brecht, M.D." and "Adult and Pediatric Medicine of Burien." Investigators found that ARS is listed on both suite 302's and 304's entrances and both suites are listed for ARS in the suite directory of the professional center. A posted sign on the front door of suite 302 directs persons to enter through suite 304. Interior Google maps pictures appear to show that the suites are connected and persons can pass through from one suite to the other after entering suite 304. Décor, signage, and advertising visible on the Google maps photos make it seem like the physical suite location of suite 302 houses ARS's patient waiting area and what appears to be consultation rooms. Similarly, former employees described that the two businesses were connected and used the same employees and the same space.

## IV.    BACKGROUND OF APM

11. Through interviews with several former employees investigators determined that, from at least 2017 through 2020, Brecht employed a physician assistant named Ona Schulz (Schulz). According to former employees, Schulz saw most APM patients while Brecht saw most ARS patients. These former employees said that most of the APM patients received opioid prescriptions. A former employee medical assistant who worked at APM explained that another physician closed his practice and referred his patients to Brecht.

12. Investigators attempted but were unable to send an undercover agent (UC) into APM as a patient. In Feburary 2020, the UC entered the BUSINESS PREMISES and the receptionist explained to the UC that it was a family medicine practice clinic but that they were not accepting patients at this time. The UC inquired about ARS and the receptionist explained that they perform cosmetic surgeries and are always accepting new

1  patients. The UC was denied an appointment to APM and left the office without being
2  seen by Brecht or Schulz.

3      13.    Investigators reviewed Schulz's and APM's prescribing data in Washington
4  State's Prescription Monitoring Program (PMP). The PMP was created in 2011 and
5  collects data from prescription dispensers to include capturing controlled substance
6  prescriptions written in Washington State. The data included in the PMP reports is
7  organized by provider information, patient information, pharmacy where the prescription
8  was filled, prescription number, prescription written and fill dates, drug information, and
9  the type of insurance or coverage which was used as a part of the prescription issuance.

10      14.    Investigators reviewed the PMP prescriptions by Schulz, Brecht, or APM,
11  for the time period of February 2019 through January 2021.  This analysis revealed
12  several patients receiving, on a monthly basis, controlled substance prescriptions from the
13  APM Physician Assistant Schulz, primarily for Oxycodone 15mg and Oxycodone 30mg.
14  During this time period Schulz prescribed over 131,947 dosage units of Oxycodone
15  15mg, and 148,622 dosage units of Oxycodone 30mg.  I know from conversations with a
16  DEA Diversion investigator that it is highly unusual for a practitioner to be prescribing
17  this amount of controlled substances unless that practitioner is a pain management
18  specialist.  According to witness interviews described below, open source investigations,
19  and surveillance, APM did not hold itself out as pain management specialists.  In April
20  2020, as part of a standard renewal investigation of her DEA registration, Schulz stated
21  that both she and Brecht are not pain management specialists.

22      15.    Investigators performed another analysis of the PMP for prescriptions
23  written by Schulz and Brecht from October 2017 to October 2019.  This analysis revealed
24  that several of the APM patients traveled long distances to be seen at APM, with some
25  patients traveling from as far as Alaska, Idaho, and Oregon.  I know from conversations
26  with other agents involved in this investigation that when a clinic has patients who travel
27  long distances to receive medical care, it can be an indication of over-prescription of
28  controlled substances.

AFFIDAVIT OF SPECIAL AGENT BRYAN AZER - 5
USAO #2020R00113

16.     Investigators interviewed several local pharmacists that filled prescriptions originating from APM.  Some of these pharmacists told investigators that the majority of the patients listed lower back pain as the reason for the prescriptions of controlled substances.  Some of the pharmacists stated that despite their comments to Schulz on the volume of controlled substances the prescriptions didn't change and there was no plan to taper those prescriptions.  A couple of pharmacists confirmed in their interviews with investigators that they had stopped filling Schulz's Oxycodone 30mg prescriptions.

## V.     PROBABLE CAUSE SHOWING FILING OF FALSE TAX RETURNS

17.     This investigation has developed probable cause to believe that, for the tax years 2015-2019, Brecht under-reported her income on her U.S. Business and Individual Income Tax Returns, include under-reporting on (a) Forms 1040 filed for Brecht, and (b) business tax returns (U.S. Income Tax Return for an S Corporation (Forms 1120-S)), filed for ARS and APM, and therefore, filing false tax returns. Reconciliations that I conducted yield material discrepancies between income received by these businesses versus the income declared on the businesses Forms 1120-S. The flow-through income resulting from ARS and APM's business returns was under-reported and thus, Brecht's personal Forms 1040 were under-reported as well.

### *Former Employee Statements about APM*

18.     Former employees agreed that APM treated pain management patients. However, former employees reported differing days that APM was open to treat pain management patients.  Former Employee JM was hired by APM/ARS in either 2016 or 2017 and worked until 2019.  JM did a variety of different jobs such as folding clothes, cleaning, answering phones, doing patient scheduling, handling of patient charts, and escorting patients around the clinic when needed.  JM stated that APM saw pain management patients every day that the clinic was open – Tuesday through Saturday. Former Employee MG worked as a Certified Medical Assistant for both APM and ARS for several months in approximately 2018.  MG noted that APM was always busy with patients and estimated that Schulz met with 15 to 20 patients in a day. Former Employee

1  JA worked as a medical assistant for ARS/APM for four months in 2017.  JA worked
2  primarily for ARS as a medical assistant, with about 10% of JA's time being spent with
3  APM.  JA said that JA's recollection was that there were only six or seven pain
4  management patients and that pain management patients were only seen on Tuesdays and
5  Saturdays.

6       19.    I conducted a review of the Prescription Monitoring Program (PMP)
7  records from 2015 through 2019 for Ona Schulz at APM, and this analysis showed that
8  APM had a large number of pain managment patients.  My analysis found that for  2015-
9  2019, at least one prescription was written on at least 250 unique days each year.  I
10 further reviewed PMP data from July 2020 through September 2020 to analyze for a
11 pattern or normal operating days of APM.  This analysis showed that at least one
12 prescription existed in the PMP system dated every Tuesday through Saturday during
13 those three months except for two Saturdays (one of which was the Fourth of July).  This
14 is consistent with APM seeing pain management practice patients five days a week.

15              *Former Employee Statements about patients paying cash*

16       20.    MG stated that all patient payments were processed at one desk in the front
17 at the end of the patient's office visit.  MG estimated that 80% to 90% of the patients paid
18 in cash for APM.  Some patients did pay copays and these copays were usually around
19 $20.  Most patients could afford the cost at the time of procedures.

20       21.    MG stated that the fees were listed on a chart.  The office visit fee for APM
21 was $150.  The fees for ARS depended on what the patient wanted to have done and were
22 decided by Brecht.  ARS required a deposit to be paid on the first appointment.  MG
23 believed the deposit was a percentage of the total procedure cost.

24       22.    JA recalled that patients of APM would pay $150 to $200 in cash for their
25 office fee.  Patients had to pay up front for the office fee of $150 for their 15-minute visit.
26 This fee did not include insurance co-pays.  JA recalled that if the patients took longer
27 than 15 minutes, then they would be charged more.  JA remembered patients also paying
28 with their credit cards and with insurance.

AFFIDAVIT OF SPECIAL AGENT BRYAN AZER - 7
USAO #2020R00113

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

23.     JA stated that patients of ARS would normally put $1,000 down as a deposit and then had to pay the remainder by their pre-operation day.  ARS offered payment options of cash, credit card, or credit care.  Most of the patients would pay with credit card or credit care.  Credit care was provided through a third-party company that offered a loan, consisting of installment payments, for cosmetic surgery procedures.

24.     JM stated that the majority of APM's patients paid with cash, some paid with a credit card, and others had Apple Health insurance.

25.     Former employee MM worked at APM and ARS as a receptionist and performed other administrative duties, for about 10 months, from 2018-2019.  MM said that about 60% of the APM patients paid cash and the remaining 40% paid by using insurance.

26.     Based on my conversations with other agents, including with a DEA diversion investigator, I know that during the time frame under investigation, patients that received opiod prescriptions were required to have an office visit to obtain that prescription.  That is, a practitioner could not write for opiod refills, and prescriptions could not simply be refilled through a telephone call, the patient needed to see the practioner every month.  This means that every time a patient of APM obtained an opioid prescription they should have also been present for an office visit.

### Former Employee Statements: Records of patient payments

27.     MG stated that all patient payments were processed at the front desk.  MG said that patients would get a copy of their receipt and the patient's payments were recorded in a receipt book.  MG never heard of a situation where a client's payment was not recorded into the receipt book.    Brecht never talked about the receipt books or about any issues with the receipt books.

28.     JA said that all patient payments were recorded in a notebook.  The notebook would include the name of the patient, amount of time spent with the doctor, how much they paid, how much they were refunded if they overpaid at the beginning, and the patient's form of payment.  The person recording the entry into the notebook

would initial the entry.  JA was not sure if there was a designation between the two
different businesses in the notebook.

29.    JM also recalled that there was a notebook kept at the front desk. She
described the notebook as a regular, "school" notebook. Information maintained in the
notebook included the patient's name, how much the patient paid, and the method of
payment. The length of time of the appointment and the types of services performed were
not usually included in the notebook. Patients of APM did not sign the notebook, but
patients from ARS did have to initial next to their payments because those payments were
generally larger.

30.    JM said when a notebook was filled up, it was taken to Brecht. JM believed
that Brecht kept these notebooks.  When in use, the notebook was kept at the front desk.

### Former Employee Statements: Brecht usually handled the cash

31.    JA, JM, and MG all noted that cash received as payment was kept in an
envelope and stored in a middle drawer of the reception desk.  JM indicated that there
was no separation of the cash paid by APM patients from the cash paid by ARS patients.

32.    JM said that at the end of the workday, the envelope with the patient cash
was taken to Brecht's office.  Brecht never counted the cash when JM was in her office
and Brecht never came back out of her office to say that some of the cash was missing.
The envelope usually contained approximately $1,000 in cash, more if surgery patients
paid that day.

33.    JM stated that, at the end of the day, Brecht reviewed the day's patients and
how much they paid.  Brecht entered the information from the notebook into an
additional notebook that Brecht maintained herself in her office.  JM saw the notebook at
the office and believes that Brecht sometimes took it home with her.  JM saw Brecht
carry a purse and a black duffel bag home with her on occasions.

34.    MG said that either Brecht or two certain employees (not former employees
interiewed during this investigation) would deposit cash into the bank.  MG recalled that
the cash never stayed at the business overnight and was always taken out.  JM also

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   believed that Brecht deposited the cash into the bank.  JM observed that Brecht took the
2   envelope of cash with her when Brecht left early on a few days.

3       35.    JM stated that Brecht handled everything related to the money flowing
4   through both of Brecht's clinics.  JM said another employee told JM that Brecht handled
5   all the billing for the clinics.  Multiple former employees indicated that Brecht handled
6   the business's finances, purchased supplies for the business, and handled the payroll.
7   Employees received handwritten payroll checks.

8         ***Brecht's tax preparers and Brecht's personal subscription of tax returns***

9       36.    For tax years 2015 through 2019 Brecht has used the same tax return
10   preparer to prepare her Forms 1040 and Forms 1120-S for ARS and APM.  The IP
11   address associated with the returns indicates that the return preparer filed her Forms 1040
12   and Forms 1120-S.  These returns listed the address of the BUSINESS PREMISES.
13   Another tax preparer (from the same office as the other tax preparer) has prepared Forms
14   940 (Employer Annual Federal Unemployment Tax Return) and Forms 941 (Employer
15   Quarterly Tax Return) for Brecht's businesses.

16       37.    Brecht's Forms 1040 were filed virtually with the IRS through her return
17   preparer.  In lieu of a physical signature, the virtual returns were subscribed through the
18   entering of Brecht's personal identification number (PIN).  Brecht's return preparer
19   subscribed/entered her PIN on her behalf for all of her forms 1040.  Brecht's personal
20   returns listed the address of the BUSINESS PREMISES.

21       38.    ARS and APM's Forms 1120-S were also filed virtually with the IRS
22   through her return preparer. In lieu of a physical signature, virtual returns were
23   subscribed through the entering of Brecht's PIN.  APM's Forms 1120-S were
24   subscribed/entered by Brecht for all Forms 1120S.  ARS's Forms 1120-S were
25   subscribed/entered by Brecht for tax year 2015 through 2017 and 2019.  ARS's 2018
26   Form 1120-S was subscribed/entered by Brecht's return preparer who entered her PIN on
27   her behalf.

28

AFFIDAVIT OF SPECIAL AGENT BRYAN AZER - 10
USAO #2020R00113

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

39.     On March 15, 2021, investigators interviewed both of Brecht's aforementioned tax return preparers who prepared Brecht's business and personal tax returns since 2013 along with Brecht's payroll tax filings.  The tax preparers said that Brecht typically provided handwritten monthly income totals for the purposes of her tax returns.  Brecht did not provide supporting documentation for the income figures; the tax preparers stated that they had not seen bank statements for Brecht's businesses. Brecht did provide credit card statements as documentation for business expenses.

40.     In the same interview, the return preparers reported that they do not believe that Brecht currently uses a bookkeeper and that she does not appear to use any accounting software like Quickbooks.  The return preparers indicated that Brecht formerly used a bookkeeper prior to 2017, but noted that the level of documentation provided to them was no different when she had a bookkeeper.

41.     The tax preparers stated they typically dropped off documents to Brecht at the BUSINESS PREMISES.  However, the tax preparers stated that Brecht likely keeps certain records at the RESIDENCE PREMISES.  One tax preparer said that he/she had prepared Brecht's business IRS Form 940 (Employer Annual Federal Unemployment Tax Return) for years 2014 through 2019.  The preparer stated that these forms needed to be amended and some had not been filed.  The tax preparer needed copies of Brecht's IRS Form 941 (Employer Quarterly Tax Return) and unemployment tax filings with the State of Washington.  Brecht told the tax preparer that these records were stored at her house (the RESIDENCE PREMISES).  The same tax preparer indicated that Brecht mentioned at other times that she kept records at her house.  The tax preparers believed that Brecht did not completely trust her employees and that she would likely keep some records at her house.  Further, a tax preparer stated that Brecht is a private person and that she would likely keep her tax and financial records at home where her employees could not see them.

//

//

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

*Reported Income from Brecht's Various Businesses*

    *Aesthetic Rejuvenation Spa (ARS)*

42.    A federal tax database search showed that ARS was opened in February of 2015 and applied to be an S-Corporation in July 2015.  ARS filed business tax returns, Forms 1120-S, for the tax years (TY) 2015 through 2019.  I reviewed the tax returns and the below information includes tax data from those returns pertinent to this investigation (all values are in USD):

| Form 1120-S Data | TY 2015 | TY 2016 | TY 2017 | TY 2018 | TY 2019 |
|---|---|---|---|---|---|
| Gross Receipts (Net Returns and Allowances) | 622,085 | 859,298 | 730,143 | 701,592 | 793,502 |
| Compensation of Officers | (200,000) | (240,000) | (240,000) | (300,000) | (300,000) |
| Rents | (26,938) | (54,569) | (50,200) | (69,034) | (68,302) |
| Taxes and Licenses | (10,185) | 0 | (101,710) | (99,736) | (100,522) |
| Other Deductions | (313,200) | (494,046) | (537,910) | (467,309) | (177,435) |
| Ordinary Business Income(Loss) | 153 | (49,439) | (220,881) | (318,279) | 72,275 |

43.    Based on my review of the Forms 1125-E, filed with the Forms 1120-S for ARS, the compensation of officers listed in the above table was paid to Brecht.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

44.     ARS's WA-DOR account was opened in August 2010 and is still active. ARS has an active status with the Washington Secretary of State (WA-SOS) and that account was set up in August 2010.

### Adult and Pediatric Medicine of Burien, LLC (APM)

45.     A federal tax database search showed that APM has been open since May 2006 and operating as an S Corporation since 2014.  APM filed Forms 1120-S from 2015 through 2019.  I reviewed the tax returns and the below information includes tax data from those returns pertinent to this investigation:

| Form 1120-S Data | TY 2015 [1] | TY 2016 | TY 2017 | TY 2018 | TY 2019 |
|---|---|---|---|---|---|
| Gross Receipts (Net of Returns and Allowances) | 277,338 | 294,644 | 341,846 | 376,650 | 489,437 |
| Salaries and Wages | (173,513) | (181,858) | (147,587) | (208,174) | (237,979) |
| Rents | (33,804) | 0 | (21,514) | (18,130) | (42,219) |
| Taxes and Licenses | (52,467) | (57,508) | (60,684) | (60,218) | (65,681) |
| Other Deductions | (208,046) | (151,441) | (217,190) | (222,759) | (111,376) |
| Ordinary Business | (202,708) | (105,287) | (149,507) | (164,444) | 5,961 |

[1] Brecht filed an amended Form 1120-S for APM for TY 2015 after it appeared that the same amount of gross receipts which were reported for ARS were also mistakenly reported for APM.  This table used the figures from the amended return.

| Income or Loss | | | | | |
|---|---|---|---|---|---|
| | | | | | |

46.     APM's WA-DOR account was opened in June 2006 and is still active. APM has an active status with SOS and that account was set up in April of 2006.

### Brecht's Personal Forms 1040

47.     Brecht filed her personal Forms 1040 from 2015 through 2019.  I reviewed the tax returns and the below information includes tax data from those returns pertinent to this investigation:

| Form 1040 Data | TY 2015 | TY 2016 | TY 2017 | TY 2018 | TY 2019 |
|---|---|---|---|---|---|
| Wages, Salaries, Tips, etc | $160,000 | $240,000 | $240,000 | $300,000 | $300,000 |
| Ordinary Dividends | $71,000 | $0 | $0 | $0 | $0 |
| Rental Real Estate, Royalties, Partnerships, S Corps, Trusts, Etc | ($134,501) | ($55,848) | ($370,388) | ($302,501) | $51,774 |
| Itemized Deductions | ($9,250) | ($9,300) | ($26,149) | ($18,000) | ($18,350) |
| Exemptions | ($8,000) | ($8,100) | ($8,100) | $0 | $0 |
| Taxable Income | $79,249 | $148,856 | $0 | $0 | $253,424 |

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

| Alternative Minimum Tax | $0 | $166 | $360 | $14,973 | $3,627 |
|---|---|---|---|---|---|
| Total Tax | $5,180 | $32,239 | $360 | $12,873 | $66,100 |

***Bank Reconciliation***

48. Subpoena responses showed that Kristine Brecht and her related entities have the following bank accounts:

| Financial Institution | Account Owner Name | Account Ending In |
|---|---|---|
| Bank of America | Adult and Pediatric Medicine | 9204 |
| Bank of America | Adult and Pediatric Medicine of Burien | 5663 |
| Bank of America | Kristine Brecht MD | 1133 |
| Bank of America | Kristine S Brecht | 8982 |
| Bank of America | Assets Rejuvenation LLC | 8612 |
| Bank of America | Equipment Rejuvenation | 5812 |
| Bank of America | Aesthetic Rejuvenation Spa LLC | 5480 |
| Bank of America | Agile Business Intelligence Inc | 3827 |
| JP Morgan Chase Bank | Kristine S Brecht MD | 6867 |
| JP Morgan Chase Bank | Kristine S Brecht MD | 5983 |
| Bank of America | Safe Rejuvenation Limited Partnership | 5456 |

49. Review of these bank accounts showed that, instead of business receipts for ARS and APM being deposited into their respective bank accounts, most of the deposits were going into the Bank of America account for APM ending in 9204 (the 9204 account). The next table shows the deposits into the 9204 account.

AFFIDAVIT OF SPECIAL AGENT BRYAN AZER - 15
USAO #2020R00113

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1

### Total Deposits Into 9204 APM Bank Account

| Bank Account | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| Total Deposits Into Account Ending in 9204 | $1,253,175.00 | $1,440,975.91 | $1,376,149.55 | $1,354,741.65 | $1,670,239.04 |
| *Less Sales Tax Included[2]* | *($1,354.62)* | *(913.81)* | *(723.99)* | *(403.68)* | *(379.08)* |
| *Less Federal Income Tax Return Refund Deposits* | | | | | *($63,318.00)* |
| *Less Potential Loans* | | | | *($12,319.71)* | *($18,755.68)* |
| *Less Bank Adjustments / Credit Adjustments* | *($191.71)* | *($144.60)* | *($49.91)* | *($134.43)* | *($29.56)* |
| *Less Transfers* | | *($30,000.00)* | | | *($50,000.00)* |
| **Total Income Deposits into 9204** | **$1,251,628.67** | **$1,409,917.50** | **$1,375,375.65** | **$1,341,883.83** | **$1,537,756.72** |

50.    The next table adds all other known income deposits across other Brecht

business accounts:

### Other Deposits into Brecht Business Bank Accounts[3]

| Bank Account | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| Income Deposits Into 5663 | - | - | $17.18 | $18,935.51 | $28.00 |
| Income Deposits Into 1133 | $12,000.00 | - | - | - | - |

---

[2] The sales tax amounts reflect the sales tax collected by APM, per WA-DOR excise tax returns.

[3] The figures for these accounts do not include identified non-income deposits such as starting balances and transfers from other Brecht-owned accounts.

AFFIDAVIT OF SPECIAL AGENT BRYAN AZER - 16
USAO #2020R00113

| | | | | | |
|---|---|---|---|---|---|
| Income Deposits Into 8982 | | | $132,577.93 | $0.77 | $0.68 |
| Income Deposits Into 5480 | - | $4,740.63 | - | - | - |
| Income Deposits Into 6867 | - | $10,000.00 | - | - | - |
| Income Deposits Into 5983 | $10,000.00 | | - | - | - |
| Total Income Deposits into 9204 | $1,251,628.67 | $1,409,917.50 | $1,375,375.65 | $1,341,883.83 | $1,537,756.72 |
| **Total of Deposits Into All Bank Accounts** | **$1,273,628.67** | **$1,424,658.13** | **$1,507,970.76** | **$1,360,820.11** | **$1,537,785.40** |

51.   This analysis shows that between $1.2 and $1.5 million was deposited into Brecht's business bank account each year from 2015 through 2019.  The next table will compare these deposits to the amounts reported by Brecht's business tax returns:

| | **2015** | **2016** | **2017** | **2018** | **2019** |
|---|---|---|---|---|---|
| Total of Deposits Into All Bank Accounts | $1,273,628.67 | $1,424,658.13 | $1,507,970.76 | $1,360,820.11 | $1,537,785.40 |
| Less Amounts Reported for APM on Forms 1120-S | ($277,338.00) | ($294,644.00) | ($341,846.00) | ($376,650.00) | ($489,437.00) |
| Less Amounts Reported for ARS on Forms 1120-S | ($622,085.00) | ($859,298.00) | ($730,143.00) | ($701,592.00) | ($793,502.00) |
| **Difference** | **$374,205.67** | **$270,716.13** | **$435,981.76** | **$282,578.11** | **$254,846.40** |

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

52.     The bank reconciliation resulted in potential unreported income amounts across ARS and APM of approximately $1,618,328.07.  This number is based solely off the amounts that were deposited into the business accounts and does not include any potential unreported cash receipts which were not deposited.

### *Analysis of Possible Cash Receipts*

53.     I reviewed the bank account deposits for the 9204 account and was able to separate the deposits into the following categories: Paymentech, Patient Care Credits/Synchrony Bank, check deposits, and other deposits.  Paymentech deposits are credit card settlements transferred into the 9204 account.  Patient Care Credits/Synchrony Bank are payments from a third-party card used to pay for medical expenses not covered by private insurance companies.  Many of the checks were from private insurance companies and patients.

54.     By removing all Paymentech deposits, Patient Care Credits, and checks from private insurance or patients; I was able to calculate an approximate assumed cash deposit total into the 9204 account.  I found the assumed cash deposits for each year to be approximately $31,528.97 in 2015; $155,965.25 in 2016; $182,210.38 in 2017; $195,181.85 in 2018; and $112,476.78 in 2019.  The approximate grand total of assumed deposits of cash into the 9204 account was more than $677,000.  When the counter credits for the other bank accounts of $168,213.38 are included the grand total assumed cash deposits is equal to approximately $845,500.

55.     These assumed cash deposits, across all bank accounts, yield an approximate percentage of cash to overall deposits of 3.48% in 2015; 11.40% in 2016; 22.89% in 2017; 15.95% in 2018; and 7.31% in 2019.  Across all the years this yields an average, approximate cash deposit percentage of 12.21%.  Former employees stated in their interviews that most of the payments for APM were cash, and based on those statements and this cash receipts analysis, it appears likely that cash deposits are not being completely deposited since the percentages are different.

AFFIDAVIT OF SPECIAL AGENT BRYAN AZER - 18
USAO #2020R00113

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

56.     As for frequency of deposits, I did not review all of the deposits for the entire investigation period for frequency of deposits, but I reviewed all deposits for calendar year 2019, the most recent data that was available.  This review showed that the 9204 account had cash/check deposits 77 times during 2019, the most deposits in any single month was nine, the least amount of deposits in any single month was four.

57.     Former employees indicated that most patients paid cash, and that then we can assume that cash receipts would have occurred on almost every business day.  From those same interviews, we know that cash was not normally left in the business and would have been given to Brecht directly at the end of each day.  This means that most likely, on days where it wasn't deposited, the cash receipts either stayed on Brecht's person or was kept in her office or residence.  I know from my experience and that of other IRS-CI special agents that cash which isn't routinely deposited, and/or not deposited in full, is often done in an attempt to hide income.

### PMP Report Reconciliation

58.     I also reviewed the Prescription Monitoring Program (PMP) data from 2015 to 2019 for Schulz in order to estimate the number of patient visits to APM and use that visit total to calculate a gross receipts figure from office visit revenues to compare back to the reported revenues on APM's Form 1120-S.  The PMP report simply captures the prescriptions issued by the providers and filled at pharmacies.

59.     Based on employee statements that indicated that most APM patients received at least one prescription per visit, to determine an approximate total number of patient visits, I organized the PMP data by patient and by date in a Microsoft Excel pivot table to calculate the total number of office visits.  The below figures are based on the assumption that a patient would have a prescription written every time they had an office visit at APM, which may not have been the case but is used for this calculation in order to be more conservative with estimates.  This analysis counted the patient only a single time for a single date, to avoid double-counting.  I used a formula that only counted the patients one time per day in order to exclude potential duplicates from when a patient

AFFIDAVIT OF SPECIAL AGENT BRYAN AZER - 19
USAO #2020R00113

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

paid with multiple payment methods or if they received multiple prescriptions in one visit.  Using the above methodology, I estimated APM office visit totals for all payment methods as: 1,876 in 2015; 2,155 in 2016; 2,545 in 2017; 2,921 in 2018; and 3,723 in 2019.

60.     Next, I excluded office visits possibly attributable to private insurance companies and Medicaid.  The private insurance figures were obtained directly from the insurance companies of Premera, Kaiser Permanente, Cambia Medical, and United Health.  The Medicaid figures were obtained directly from Medicaid Physician claims for Brecht during the same time period.  Using the same methodology as used on PMP, I calculated a office visit total.  I calculated an even more conservative estimate by removing the additional PMP payment categories of other pay and workers' compensation.

61.     This net figure yielded office visits of 32 in 2015; 710 in 2016; 1,124 in 2017; 1,340 in 2018; and 2,104 in 2019.  By taking the above figures and multiplying by an average office fee of $150 as stated by multiple employees in interviews, I was able to arrive at estimated cash-only office visit fees equal to $4,800 in 2015; $106,500 in 2016; $168,600 in 2017; $201,000 in 2018; and $315,600 in 2019.  The grand total of cash payments for office visits was estimated to be $796,500.  This figure is comparable to the total estimated cash deposits, including counter credits to the other bank accounts, of $845,500.

62.     Combining the conservative estimated cash-only office visits per the PMP from 2015-2019 of $796,500 with deposits into the 9204 account from 2015-2019: including the Paymentech deposits of $3,541,324.61,  the Synchrony Bank deposits of $984,283.59, and the known check deposits from insurance companies and Groupon of $1,698,520.38 – it results in an estimated total income for ARS and APM of $7,020,628.58.  Similar to the bank receoncialation figure above, this figure based on the PMP exceeds the reported income of ARS and APM by more than $1.5 million for both businesses during the investigative period.

AFFIDAVIT OF SPECIAL AGENT BRYAN AZER - 20
USAO #2020R00113

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1

### *WA Dept. of Revenue Combined Excise Tax Returns Reconciliation*

2    63.    Businesses in the state of Washington are required to file and pay business

3  and occupation taxes on their gross receipts either on a yearly, quarterly or monthly basis.

4  I requested from WA-DOR the various Combined Excise Tax Returns (CETR) for APM

5  and ARS.  I reconciled the WA-DOR CETRs filed by APM and ARS to the various

6  business tax returns filed with the IRS.  I found that Brecht reported approximately

7  $254,000 more in gross receipts to WA-DOR than to the IRS for APM and ARS

8  combined.  The discrepancy mostly came from tax years 2015 and 2016.

9    ### *Other Brecht businesses*

10    64.    The investigation has shown, through federal tax databases and searches of

11  Washington state databases, that Brecht controls at least four other businsess: First,

12  Brecht controls Assets Rejuvenation LLC (created in December 2017).  Assets

13  Rejuvenation filed tax forms in 2017-2019, but it reported no gross receipts from its

14  business activities to the IRS.  Assets Rejuvenation does not have an active tax account

15  with the WA-DOR but does have an active status with WA-SOS and that account was set

16  up in October 2017.

17    65.    Second, Brecht controls Agile Business Intelligence (created in December

18  2018).  Aglie Business Intelligence has not filed tax forms with the IRS, it does not have

19  an active tax account with the WA-DOR, but does have an active status with WA-SOS

20  and that account was set up in January 2018.

21    66.    Third, Brecht controls Stem Cell Rejuvenation, Inc. (created in 2017).

22  Stem Cell Rejuvenation filed tax forms with the IRS from 2017-2019, but it reported no

23  gross receipts from its business activities to the IRS.  Stem Cell Rejuvenation does not

24  have an active tax account with the WA-DOR but does have an active status with WA-

25  SOS and that account was set up in July 2017.

26    67.    Fourth, Brecht controls Cinderella Anesthesia LLC (created in 2018).

27  Cinderella Anesthesia LLC has not filed any Forms 1120S.  Cinderella Anesthesia LLC

28

1   does not have an active tax account with the WA-DOR but does have an active status

2   with WA-SOS and that account was set up in August 2017.

3     68. Similar to ARS and APM, the operations of these other businesses are

4   commingled.  Stem Cell Rejuvenation has a sign for the business noted on the

5   BUSINESS PREMISES.  Former employee JA stated that Brecht was involved in stem

6   cell work in 2017.  There are two payments, totaling $12,000, deposited in the 9204 bank

7   account from a vendor named US Stemology Inc. in 2019, addressed to ARS and Dr.

8   Kristine Brecht, with memo lines indicating the payments were for stem cell deployments

9   in 2018 and 2019  It is unknown at this time if these payments from Stemology were

10  related to ARS or APM business activities and if the stem cell work that was noted by the

11  former employee produced any material income or expenses.  Review of records for these

12  associated businesses will help determine whether those entities should have filed tax

13  returns and will assist to accurately calculate the potential flow through income from

14  those businesses and their effect on Brecht's personal tax returns.

15    **VI. PROBABLE CAUSE THAT EVIDENCE WILL BE FOUND AT THE**
    **BUSINESS PREMISES AND THE RESIDENCE PREMISES**

17    69. This investigation has found, as shown above, that Brecht and her

18  businesses ARS and APM are primarily maintaining hard/paper copies for record keeping

19  purposes.  Since this investigation found that the businesses of ARS and APM are

20  accepting a significant portion of their gross receipts in the form of cash, and recording

21  sales in a written log, a search warrant of the business locations of ARS and APM and the

22  home residence of Brecht, is necessary to obtain those records.  The use of a search

23  warrant also helps protect these records from tampering and or destruction, which can

24  occur if the investigation was overt and trying to obtain the records in a different form.

25    ***BUSINESS PREMISES***

26    70. I believe probable cause exists to conclude that evidence of the above-

27  mentioned alleged crimes will be found at the BUSINESS PREMISES.  I believe that tax

28  records and business records are being retained at the BUSINESS PREMISES. As of

March 2021, the BUSINESS PREMISES appear to still be used for business purposes. The below information summarizes the probable cause for evidence being present at both target locations.

71.     Investigators conducted surveillance on multiple days in March 2021.  The surveillance established that APM and ARS are still open.  For example, investigators conducted surveillance of the BUSINESS PREMISES on Tuesday, March 2, 2021 through Friday, March 5, 2021 in order to establish a more accurate pattern of business activity.  Investigators observed Brecht and other individuals entering ARS and APM premises early every morning before the business was open to the public.  Investigators also observed various individuals knocking on the main door of suite 304 and entering the business after it was open.  Based on the training and experience of the investigators, the investigators concluded that these individuals were patients.  Brecht herself was seen letting these individuals into the BUSINESS PREMISES.

72.      Further, a sign posted outside the joint entrance to APM/ARS listed "CLINIC HOURS" on Tuesday through Saturday.  Interviews of former employees confirmed that the clinic was open Tuesday through Saturday.

73.     Additionally, APM and ARS appear to be ongoing medical practices.  This search warrant seeks authorization to seize only items related to the income and expenses of these businesses (and the other Brecht businesses), and amounts the businesses charged for the services, but does not include patient records, diagnosis information, or medical histories.

### RESIDENCE PREMISES

74.     I believe probable cause exists to conclude that evidence of the above-mentioned alleged crimes will be found at the RESIDENCE PREMISES.  I believe that tax records and business records are being retained at Brecht's residence.

75.     Based on the above-described interview with Brecht's tax preparers, there is probable cause that records related to the crime of filing false tax returns will be found

AFFIDAVIT OF SPECIAL AGENT BRYAN AZER - 23
USAO #2020R00113

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   at her residence.  As described above, Brecht told her tax preparer that she stored IRS
2   Form 941s and unemployment tax filings records at the RESIDENCE PREMISES.

3        76.   One of the tax preparers (who had worked with Brecht since 2013)
4   indicated that Brecht mentioned at other times that she kept records at her house.  The tax
5   preparers believed that Brecht did not completely trust her employees and that she would
6   likely keep some records at her house.  Further, a tax preparer stated that Brecht is a
7   private person and that she would likely keep her tax and financial records at home where
8   her employees could not see them.

9        77.   As discussed above, JM stated that Brecht kept a notebook with a list of all
10   the people that paid the clinics.  JM saw the notebook at the office and believes that
11   Brecht sometimes took it home with her.  JM saw Brecht carry a purse and a black duffel
12   bag home with her on occasions.

13        78.   I conducted two trash pulls, on November 24, 2020 and December 8, 2020
14   from the RESIDENCE PREMISES.  I uncovered several documents consistent with
15   Brecht working at home, including:

16       A.   A printed email originally from tinabrechtmd@hotmail.com to
17          tinabmd123@hpeprint.com which contained a forwarded message, sent on
18          11/4/2020, from Team Sundance at sundance@advicemedia.com related to
19          skin tightening questions and her surgical center and how it sets her apart.

20       B.   Several documents pertaining to vampire facelifts printed onto the back of
21          other received mail.  These documents describe the purpose of those
22          facelifts and the benefits.  They also contain treatment dosage and a listed
23          cost of $1,795.  The bottom of the document contains a signature line for
24          Aesthetic Rejuvenation by Dr. Brecht and lists ARS's website and address.

25       C.   A printed document which shows a Medscape login.  Medscape appears to
26          be a website for accessing medical news/expert perspectives, essential
27          drugs, diseases and clinical tools, and Free CME and professional online
28          education.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

79.     Based upon my training and experience and that of other law enforcement officers, I know that business correspondence and business documents which are found at a location are an indication that there are other documents and financial records at that location.  This is also true for purposes of tax records as most individuals keep their personal tax records and or relevant business records at their residence.

### Surveillance of Brecht at BUSINESS PREMISES and RESIDENCE PREMISES

80.     Investigators conducted surveillance on January 5, 2021.  They observed Brecht arriving at the BUSINESS PREMISES in the morning and travel in the direction of APM and ARS with two bags.  In the late afternoon, they observed Brecht approach her car from the direction of the BUSINESS PREMISES with boxes which she loaded into the trunk in her car.  They later saw Brecht arrive at the RESIDENCE PREMISES and saw Brecht unload items from her trunk and take them into her personal residence. They saw Brecht take multiple trips to unload items from her trunk.  However, due to it being dark, they were unable to confirm if these items were the same boxes which they had observed being placed into the trunk of her vehicle earlier.

81.     I conducted surveillance on January 6, 2021.  I saw Brecht exit the RESIDENCE PREMISES in the morning, carrying only a large purse/bag and get into her vehicle.  Another investigator observed Brecht arrive at work and enter the BUSINESS PREMISES.  Later that day, I observed Brecht as she left from the direction of the BUSINESS PREMISES with the same purse/bag and enter her vehicle.  I followed Brecht and observed her enter the RESIDENCE PREMISES with the same bag.

### Agent Training and Experience

82.     Based upon my training and experience and conversations with other IRS-CI special agents, I know that companies often keep their financial and business records where they conduct business.  This allows the company to consult and use the information when making business decisions and preparing financial information, including for legal and regulatory purposes such as filing tax returns.  The records kept at

AFFIDAVIT OF SPECIAL AGENT BRYAN AZER - 25
USAO #2020R00113

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1 a place of business often relate to a company's current and historical activity and

2 performance.  Such documents include:

    A.  Banking records, such as bank statements, cancelled checks, withdrawal

3        slips, check registers, deposit tickets, loan documents, and correspondence;

4

    B.  Income records, such as sales invoices, receipts, cash register tapes, cash

5        receipt logs, sales journals, credit card merchant account statements and

6        records, and customer information;

7

    C.  Expense records, such as purchase receipts, invoices, credit card statements,

8        copies of cashier's checks, petty cash logs, journals and ledgers of

9        expenditures;

10

    D.  Asset acquisition and disposal records, such as titles, deeds, contracts,

11      receipts, inventory records, invoices and depreciation schedules;

12

    E.  Payroll records, such as employee lists, timecards, Forms W-2, Forms W-4,

13      and records of payments;

14

    F.  Financial records, such as income statements, cash flow statements, balance

15      sheets, bookkeeping records, and income and expense projections;

16

    G.  Tax documents, such as filed and unfiled state and federal income and

17      excise tax returns and employment tax returns;

18

    H.  Audit and compliance records, such as correspondence with or about audits

19      and compliance requirements, copies of complete or incomplete financial

20      disclosure forms, including Form 8300;

21

    I.  Regulatory and industry association information, such as guides to best

22      practices, industry training/conference materials, rules and regulations,

23      business and other licenses, pamphlets/notices, regulatory and compliance

24      requirements, and correspondence with regulatory agencies; and

25

    J.  Corporate records, such as incorporation records, annual reports, stock

26      books/ownership records, agreements, and shareholder or investor loans.

27

28

83.     A company's books and records are made to trace or track the flow of funds into and out of the business, to and from owners, investors, lenders, suppliers, customers and others.  These books and records are also used as the basis for the preparation of financial statements and for the preparation of tax returns due to federal, state, and local taxing authorities;

84.     Owners of small and closely held businesses often keep personal records and documents at their place of business or personal residence.  These records often include personal bank records, records showing asset ownership and acquisition, investments, records of cash hoards, insurance records, loan records, promissory notes, agreements, correspondence, travel documents, safe deposit box keys, notes, and tax information.

85.     These business and personal records can be useful in showing whether a person or entity reported all income to the IRS or evaded federal tax requirements.  It is useful to compare tax and financial records maintained by a business over the course of multiple years in order to evaluate, among other things, the business' income, expenditures, and accounting practices.  Companies retain business records for extended periods of time and are legally obligated to retain tax records for multiple years after a return is filed or tax is paid.  Likewise, individuals who file personal income and business or partnership income tax returns will often maintain copies of those returns, along with supporting work papers and other documentation relating to those returns.

86.     Individuals who attempt to conceal their true income, and the true income of companies they control, often retain at their business location and at their personal residence, records with false entries, such as nominee names, altered dates, altered amounts, altered classifications and altered descriptions of business transactions or a separate set of accounting records that document sources of income not reported to taxing authorities.

87.     Individuals who attempt to conceal their true income may retain at their business location, and at their personal residence, secret bank, brokerage, and other

AFFIDAVIT OF SPECIAL AGENT BRYAN AZER - 27
USAO #2020R00113

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

financial institution account records, in some cases both foreign and domestic, that document the flow of funds into and out of the business or records relating to the identity of undisclosed principals and related party transactions.

88.     Individuals who attempt to conceal their true income and the true income of companies they control often retain at their business location, and at their personal residence, books and records evidencing the obtaining, secreting, transfer or concealment of assets and the obtaining, secreting, transfer, concealment and expenditure of money, where that individual has ready access to these documents.

## VII.   SEARCH AND SEIZURE OF DIGITAL DEVICES

89.     Further, I believe that there is probable cause to seize and search digital devices found at the BUSINESS PREMISES, as described on Attachment B-1, including Brecht's cellular telephone.  As described below, Brecht and ARS/APM employees used computers for patient scheduling and patient billing.  Brecht has used her telephone to communicate with her tax preparers and take pictures of tax-related documents.  This affidavit does not seek authority to seize and search digital devices located at the RESIDENCE PREMISES.

90.     JM, who was employed at the BUSINESS PREMISES for several years until 2019, noted that there were four electronic devices in the office.  JM stated that two of those devices were computers and were located at the front desks, one for ARS and one for APM and that those computers were used for appointment scheduling.  The other two devices were computers, of which, one was in Brecht's office and one in Schulz's office.  JM believed that Brecht likely used her computer for billing and patient notes while Schulz likely used her computer for scripts and patient notes.

91.     MG recalled four computers in the office.  One device was a desktop which was at the front desk.  Another device was an iPad which was used by all employees for clients and taking business calls.  The last device was another desktop which was used for billing and insurance purposes for APM.  MG knew that Brecht had a desktop in her office as well.

AFFIDAVIT OF SPECIAL AGENT BRYAN AZER - 28
USAO #2020R00113

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

92.     JA remembered around three electronic devices.  Two of those were computers and were at the front desk and were used to check in APM patients on one computer and ARS patients on another computer.  JA remembered that some patient records or information were stored electronically and used for charts.

93.     Both tax preparers communicate with Brecht via a cellular telephone with the number (774) 239-1396.  The tax preparers communicate through text messages and phone calls to that number.  Most of the content from those conversations was about payroll, record and document needs, and other questions they might have.  A tax preparer confirmed that they received some pictures/screen shots from Brecht of Forms W-3 and other payroll documents.  Therefore, pictures or other documents related to Brecht's businesses may be stored on Brecht's cellular telephone.

94.     As described above and in Attachment B-1 to this application, this application seeks permission to search for evidence, fruits and/or instrumentalities that might be found on the BUSINESS PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a server, computer hard drive or other electronic storage media.  Thus, the warrant applied for, would authorize the seizure of digital devices or other electronic storage media or, potentially, the copying of electronically stored information, under Rule 41(e)(2)(B).

95.     Based on my knowledge, training, and experience and that of other law enforcement personnel, specifically, trained computer investigative specialists, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

96.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

97.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

98.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

99.     Forensic evidence.  As further described in Attachment B-1 to this application, incorporated by reference herein, the application for a warrant to search the BUSINESS PREMISES seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on any storage medium at the BUSINESS PREMISES because:

A. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

B.  Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

C.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

D.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

E.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-

1   forensic programs or anti-virus programs (and associated data) may be relevant to

2   establishing the user's intent.

## VIII.   REQUEST FOR AUTHORITY TO CONDUCT OFF-SITE SEARCH OF DIGITAL DEVICES

5   100.   In most cases, a thorough search of premises for information that might be

6   stored on digital devices or other electronic storage media requires the seizure of the

7   physical items and later off-site review consistent with the warrant.  In lieu of removing

8   all of these items from the premises, it is sometimes possible to make an image copy of

9   the data on the digital devices or other electronic storage media, onsite.  Generally

10  speaking, imaging is the taking of a complete electronic picture of the device's data,

11  including all hidden sectors and deleted files.  Either seizure or imaging is often

12  necessary to ensure the accuracy and completeness of data recorded on the item, and to

13  prevent the loss of the data either from accidental or intentional destruction.

14  101.   This is true because of the following:

15          i.   The time required for an examination. As noted above, not all

16  evidence takes the form of documents and files that can be easily viewed on site.

17  Analyzing evidence of how a computer has been used, what it has been used for, and who

18  has used it requires considerable time, and taking that much time on premises could be

19  unreasonable. As explained above, because the warrant calls for forensic electronic

20  evidence, it is exceedingly likely that it will be necessary to thoroughly examine the

21  respective digital device and/or electronic storage media to obtain evidence.  Computer

22  hard drives, digital devices and electronic storage media can store a large volume of

23  information.  Reviewing that information for things described in the warrant can take

24  weeks or months, depending on the volume of data stored, and would be impractical and

25  invasive to attempt on-site.

26          ii.   Technical requirements.  Digital devices or other electronic storage

27  media can be configured in several different ways, featuring a variety of different

28  operating systems, application software, and configurations.  Therefore, searching them

AFFIDAVIT OF SPECIAL AGENT BRYAN AZER - 32
USAO #2020R00113

sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises.  However, taking the items off-site and reviewing them in a controlled environment will allow examination with the proper tools and knowledge.

              iii.   Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of electronic storage media formats and on a variety of digital devices that may require off-site reviewing with specialized forensic tools.

## IX.     SEARCH TECHNIQUES

102.   Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, the warrant I am applying for will permit seizing, imaging, or otherwise copying digital devices or other electronic storage media that reasonably appear capable of containing some or all of the data or items that fall within the scope of Attachment B-1 to the application for warrant, and will specifically authorize a later review of the media or information consistent with the warrant.

103.   ARS and APM are functioning companies that conduct legitimate business.  The seizure of their computers may limit their ability to conduct its legitimate business.  As with any search warrant, I expect that this warrant will be executed reasonably.  Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied.  Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption.  If employees of ARS and APM so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the company's legitimate business.  If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

AFFIDAVIT OF SPECIAL AGENT BRYAN AZER - 33
USAO #2020R00113

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

104.   Consistent with the above, I am requesting the authority to seize and/or obtain a forensic image of digital devices or other electronic storage media that reasonably appear capable of containing data or items that fall within the scope of Attachment B-1 to this application, and to conduct off-site searches of the digital devices or other electronic storage media and/or forensic images, using the following procedures:

***Processing the Search Sites and Securing the Data***

105.   Upon securing the physical search site, the search team will conduct an initial review of any digital devices or other electronic storage media located at the subject premises described in Attachment A-1 that are capable of containing data or items that fall within the scope of Attachment B-1 to this Affidavit, to determine if it is possible to secure the data contained on these devices onsite in a reasonable amount of time and without jeopardizing the ability to accurately preserve the data.

106.   In order to examine the electronically stored information ("ESI") in a forensically sound manner, law enforcement personnel with appropriate expertise will attempt to produce a complete forensic image, if possible and appropriate, of any digital device or other electronic storage media that is capable of containing data or items that fall within the scope of Attachment B-1.

107.   A forensic image may be created of either a physical drive or a logical drive. A physical drive is the actual physical hard drive that may be found in a typical computer. When law enforcement creates a forensic image of a physical drive, the image will contain every bit and byte on the physical drive. A logical drive, also known as a partition, is a dedicated area on a physical drive that may have a drive letter assigned (for example the c: and d: drives on a computer that actually contains only one physical hard drive). Therefore, creating an image of a logical drive does not include every bit and byte on the physical drive. Law enforcement will only create an image of physical or logical drives physically present on or within the subject device. Creating an image of the devices located at the search location described in Attachment A-1 to this application will not result in access to any data physically located elsewhere. However, digital devices or

other electronic storage media at the search location described in Attachment A-1 to this application that have previously connected to devices at other locations may contain data from those other locations.

108.     In addition to creating an image of a physical or logical drive from a digital device or other electronic storage media, law enforcement may attempt to create an image of the random access memory ("RAM") of a digital device.  Agents may only create an image of a digital device's RAM if the computer is powered on at the time of the search. This is because RAM is only active when the device is in operation.  Any data contained in the RAM will be lost when the computer is powered off.  A computer's RAM may contain evidence related to who else is logged onto the computer (even remotely), open connections that might indicate a program is waiting for commands, passwords for encryption programs, hardware and software settings, maps of recent files and applications accessed, and information related to what communication vendors have recently been utilized on the device (i.e. instant messaging services, e-mail services, social networking sites, etc.).  In addition, RAM may contain encryption keys necessary to access other elements of the subject device.

109.     If based on their training and experience, and the resources available to them at the search site, the search team determines it is not practical to make an on-site image within a reasonable amount of time and without jeopardizing the ability to accurately preserve the data, then the digital devices or other electronic storage media will be seized and transported to an appropriate law enforcement laboratory to be forensically imaged and reviewed.

*Searching the Forensic Images*

110.     Searching the forensic images for the items described in Attachment B-1 to this application may require a range of data analysis techniques.  In some cases, it is possible for agents and analysts to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.  In other cases, however, such

AFFIDAVIT OF SPECIAL AGENT BRYAN AZER - 35
USAO #2020R00113

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

techniques may not yield the evidence described in the warrant, and law enforcement may need to conduct more extensive searches to locate evidence that falls within the scope of the warrant.  The search techniques that will be used will be only those methodologies, techniques and protocols as may reasonably be expected to find, identify, segregate and/or duplicate the items authorized to be seized pursuant to Attachment B-1 to this application to this Affidavit.  Those techniques, however, may necessarily expose many or all parts of a hard drive to human inspection in order to determine whether it contains evidence described by the warrant.

111.    These methodologies, techniques and protocols may include the use of a "hash value" library to exclude normal operating system files that do not need to be further searched. Agents may utilize hash values to exclude certain known files, such as the operating system and other routine software, from the search results. However, because the evidence I am seeking does not have particular known hash values, agents will not be able to use any type of hash value library to locate the items identified in Attachment B-1 to this application.

X.    **RISK OF DESTRUCTION OF EVIDENCE**

112.    I know, based on the training and experience of myself and other law enforcement personnel, that digital information can be very fragile and easily destroyed. Digital information can also be easily encrypted or obfuscated such that review of the evidence would be extremely difficult, and in some cases impossible.  I do not know whether Brecht or employees of ARS and APM, used encryption on the computer systems they utilize to engage in the alleged crimes. If an encrypted computer is either powered off, or if the user has not entered the encryption password and logged onto the computer, it is likely that any information contained on the computer will be impossible to decipher.  If the computer is powered on, however, and the user is already logged onto the computer, there is a much greater chance that the digital information can be extracted from the computer.  This is because when the computer is on and in use, the password has already been entered and the data on the computer is accessible.  However, giving the

AFFIDAVIT OF SPECIAL AGENT BRYAN AZER - 36
USAO #2020R00113

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

owner of the computer time to activate a digital security measure, pull the power cord from the computer, or even log off of the computer, could result in a loss of digital information that could otherwise have been extracted from the computer.

113.    All interviews with former employees and the current tax preparers indicate that Brecht appears to be accounting for her business income without the aid of an accounting system like QuickBooks and is not using a third party or internal employee to assist with her accounting.  The records given to the tax preparers are only monthly totals with no breakdown between payment type, dates, patients, or any other identifying information.  This means that the sole completely accurate and true version of all income that APM and ARS received would exist in the receipt book journals/payment notebooks.  There is probable cause to believe that these notebooks are being stored in the BUSINESS PREMISES and/or the RESIDENCE PREMISES.  Therefore, a search warrant executed at both locations at the same time is necessary to seize all available notebooks at one time.  Attempting to obtain the evidence through other investigative techniques would require that the target to become aware of the investigation's focus and could lead to the destruction of the notebooks or other relevant evidence.

## XI.    CONCLUSION

114.    Based upon the evidence set forth herein, I respectfully submit there is probable cause to believe that evidence, fruits, and instrumentalities of the crimes set forth in paragraph one, above, are likely to be found in the BUSINESS PREMISES and the RESIDENCE PREMISES, more fully described in Attachments A-1 and A-2 to this affidavit. I therefore request that the Court issue a Warrant authorizing the search of the BUSINESS PREMISES, as well as any digital devices and electronic storage media located therein, for the items described in Attachment B-1 to this affidavit, and for the

//

//

AFFIDAVIT OF SPECIAL AGENT BRYAN AZER - 37
USAO #2020R00113

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  search of the RESIDENCE PREMISES, for the items described in Attachment B-2 to this
2  affidavit.

3
4  _____
   BRYAN AZER, Special Agent
5  Internal Revenue Service Criminal Investigation

6
7      The above-named agent provide a sworn statement to the truth of the foregoing
   affidavit by telephone on __30th__ day of March, 2021.
8

9
10 _____
   MARY ALICE THEILER
11 United States Magistrate Judge

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

AFFIDAVIT OF SPECIAL AGENT BRYAN AZER - 38
USAO #2020R00113

1
2

**ATTACHMENT A-1**
**PREMISES TO BE SEARCHED**

3       This affidavit is made in support of an application for warrants to search the following
4   locations (collectively, the "BUSINESS PREMISES"):

5
6       The business offices of Adult and Pediatric Medicine / Kristine Brecht M.D. ("APM")
7       and Aesthetic Rejuvenation and Spa ("ARS") physically located at 14212 Ambaum
8       Boulevard SW, Suites 302 and 304, Burien, WA 98166-1437.

9       These suites are in a multi-story office building that contains several other medical
10  practices and medical offices, collectively known as the Ambaum Professional Center.  The
11  office building is located directly to the east of Ambaum Boulevard and to the south of SW
12  142nd St and to the north of SW 142nd Pl.  The exterior of the building is brown/tan in color
13  with a white roof trim, and tan columns extending from street level to the roof.  The third-floor
14  offices are on the top floor and are visible from the street line.  Each suite has the same dark
15  brown door paneling with window inserts.  The door of suite 302 shows the suite number and the
16  name ARS embossed in gold lettering on the glass insert of the door.  The lettering on suite 302
17  indicates that that suite also includes Stem Cell Rejuvenation, another business owned by
18  Kristine Brecht.  The front door of suite 304 shows the suite number and the name ARS and
19  APM embossed in gold lettering on the glass insert of the door.  The lettering on suite 304
20  indicates that that suite also includes Kristine S Brecht MD, which is associated with APM.
21  Although both suites list ARS, there is a printed sign taped to the window of suite 302 which
22  directs persons to suite 304 as the entrance.  There appears to be two reception and waiting areas
23  for patients, one for each business, with ARS' being located and visible through the door of suite
24  302 and APM's being located and visible through the door of suite 304.  Name plates just south
25  of the door of suite 304 lists the business names of ARS and APM and lists hours for each day
26  and lunch times.  ARS and APM are both also listed on the Ambaum Professional Center suite
    signs near the main floor entrance of the building and on the north most stairwell.

27
28      The business exterior and suite entrances are pictured below:

ATTACHMENT A-1 & B-1

USAO #2020R00113 - 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28






ATTACHMENT A-1 & B-1

USAO #2020R00113 - 2

1
2
3
4
5
6
7
8
9
10
11
12
13



14
15
16
17
18
19
20
21
22
23
24



25
26
27
28

ATTACHMENT A-1 & B-1

USAO #2020R00113 - 3

1
2

**ATTACHMENT B-1**
**PROPERTY AND ITEMS TO BE SEARCHED FOR AND SEIZED**

3      The following items, records documents, files, or materials, in whatever form,

4 including handmade or mechanical form (such as printed, written, handwritten, or typed);

5 photocopies or other photographic form; and electrical, electronic, and magnetic form

6 (such as hard drives, tapes, cassettes, hard disks, floppy disks, diskettes, compact discs,

7 CD-ROMs, DVDs, optical discs, Zip cartridges, printer buffers, smart cards, or electronic

8 notebooks, or any other storage medium) that constitute evidence, instrumentalities, or

9 fruits of violations of Title 26, United States Code Section 7206(1) (Filing of a False Tax

10 Returns) for the tax years 2015 through 2019 ("the investigation period") related to

11 Kristine Brecht (XXX-XX-0295) (Brecht); ARS (47-3018148); APM / Kristine Brecht

12 M.D. (20-4211268, including the following:

13         1.      Evidence of the income and expenses of Brecht, ARS, and APM, as

14      well as other Brecht-controlled businesses, specifically: Assets Rejuvenation LLC

15      (82-3048713); Agile Business Intelligence, Inc. (82-4992004); Stem Cell

16      Rejuvenation, Inc. (82-2777827); and Cinderella Anesthesia LLC (82-4383565).

17      These records include internal accounting records, such as receipt books, journals,

18      ledgers, billing records and invoices,  payroll records, cash receipts, credit card

19      receipts, home loan applications, deeds of trust, mortgage documents, cash

20      expenses, worksheets that accompany internal accounting, and QuickBooks or any

21      other accounting software programs and records;

22         2.      Evidence of income and expense records for any of the

23      aforementioned entities, such as bank records, bank statements, deposit slips,

24      cancelled checks, wire transfers, other receipts showing evidence of money

25      transfers, withdrawals, or deposits.  This can include receipts for cashier checks,

26      money orders, financial statements, correspondence, investment accounts,

27      accounting records, records of purchases and revenues receipted payroll records,

28      income and informational tax returns, loan, and mortgage records;

ATTACHMENT A-1 & B-1

USAO #2020R00113 - 4

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

3.      Evidence of the receipt or storage of cash; if cash is observed, it will be documented but the cash will not be seized without further order of the Court.

4.      Tax preparation records, sheets, ledgers, schedules, statements, forms, summaries, correspondence, notes, organizers, receipts, and planners for the investigation period;

5.      Federal Income Tax Returns, Forms, and Schedules, filed or unfiled, including Forms 1040 and accompanying schedules and worksheets; Forms 1120S and accompanying schedules and worksheets; Forms 1065 and accompanying schedules and worksheets; Forms W-2, Forms 1099, and U.S. Information Returns for the investigation period;

6.      State and local tax returns as well as schedules, workpapers, documents, correspondence, and records used in the preparation of such forms for the investigation period;

7.      Appointment schedule books or organizers, rolodex, client list, email lists, contacts, vendor list, telephone numbers, personnel records and/or other non-medical records/items identifying clients or vendors or employees;

8.      Correspondence, including email, to and from Brecht or anyone acting upon her behalf, or on behalf of any of the aforementioned businesses regarding income, expenses, tax avoidance techniques, financial information, tax returns and information, or other non-medical business communications for the investigation period;

9.      All records relating to the identity, work background, educational background, length of employment, and amounts of compensation paid to individuals employed or contracted by the subjects and the previously identified businesses during the investigation period, including personnel files, resumes, records of certifications and accreditation, records of training and licensing, and Forms 1099 or 2099-Misc relating to such individuals;

ATTACHMENT A-1 & B-1

USAO #2020R00113 - 5

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

10.     All records relating to work background, educational background, certifications, accreditations, diplomas, and professional training and licensing of Kristine Brecht;

11.     All marketing materials marketing the identified businesses of the subjects for the investigation period;

12.     All records and documents relating to the ownership, establishment, and control of the premises to be searched;

13.     Digital devices[1] or other electronic storage media[2] and/or their components, which include:

a.   The cellular telephone with the telephone number (774) 239-1396 and used by Kristine Brecht.

b.   Any digital device or other electronic storage media capable of being used to commit, further, or store evidence of the offense listed above;

c.   Any digital devices or other electronic storage media used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, cameras, printers, plotters, encryption devices, and optical scanners;

d.   Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC

---

[1] "Digital device" includes any device capable of processing and/or storing data in electronic form, including, but not limited to: central processing units, laptop, desktop, notebook or tablet computers, computer servers, peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media, related communications devices such as modems, routers and switches, and electronic/digital security devices, personal data assistants ("PDAs"), and iPods/iPads.  Except as explained below, digital devices does not include cellular telephones

[2] Electronic Storage media is any physical object upon which electronically stored information can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

ATTACHMENT A-1 & B-1

USAO #2020R00113 - 6

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

e.  Any documentation, operating logs and reference manuals regarding the operation of the digital device or other electronic storage media or software;

f.  Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

g.  Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

h.  Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

14.  For any digital device or other electronic storage media upon which electronically stored information that is called for by this warrant may be contained, or that may contain things otherwise called for by this warrant:

1.  Evidence of who used, owned, or controlled the digital device or electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat", instant messaging logs, photographs and correspondence;

2.  Evidence of software that would allow others to control the digital device or electronic storage media, such as viruses, Trojan Horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

ATTACHMENT A-1 & B-1

USAO #2020R00113 - 7

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

3. Evidence of the lack of such malicious software;

4. Evidence of the attachment to the digital device or other storage devices or similar containers for electronic evidence;

5. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the digital device or other electronic storage media;

6. Evidence of the times the digital device or other electronic storage media was used;

7. Passwords, encryption keys, and other access devices that may be necessary to access the digital device or other electronic storage media;

8. Documentation and manuals that may be necessary to access the digital device or other electronic storage media or to conduct a forensic examination of the same;

15. Records of or information about the use of an Internet Protocol address to communicate with the Internal Revenue Service and the subject and their identified businesses and clients relating to the investigation period including;

1. Records of or information about the internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses;

2. Records of Internet Protocol addresses used;

3. Any other electronic information (including but not limited to Device ID) necessary to determine which digital devices or other electronic storage media were used in the preparation and/or filing of tax returns;

ATTACHMENT A-1 & B-1

USAO #2020R00113 - 8

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2  THE SEIZURE OF DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE

3  MEDIA AND/OR THEIR COMPONENTS AS SET FORTH HEREIN IS

4  SPECIFICALLY AUTHORIZED BY THIS SEARCH WARRANT, NOT ONLY TO

5  THE EXTENT THAT SUCH DIGITAL DEVICES OR OTHER ELECTRONIC

6  STORAGE MEDIA CONSTITUTE INSTRUMENTALITITES OF THE CRIMINAL

7  ACTIVITY DESCRIBED ABOVE, BUT ALSO FOR THE PURPOSE OF THE

8  CONDUCTING OFF-SITE EXAMINATIONS OF THEIR CONTENT FOR

9  EVIDENCE, INSTRUMENTALITIES, OR FRUITS OF THE AFOREMENTIONED

10 CRIMES.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ATTACHMENT A-1 & B-1

USAO #2020R00113 - 9

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

**ATTACHMENT A-2**
**PREMISES TO BE SEARCHED**

2

3        This affidavit is made in support of an application for warrants to search the following

4    location:

5        The personal residence of Kristine Brecht located at 1865 SW Miller Creek Rd, Burien,

6    WA 98166.

7        The residence to be searched is located at the end of a private drive off SW Miller Creek

8    Rd and the residence sits next to Miller Creek and a beach park.  The residence has a white

     exterior, numerous gable style windows, and a steep brown roof.  There appears to be new

9    construction, presumably as an add on to the residence, to the north of the residence.  The front

10   door is positioned to look south from the residence and is blue in color with two window cutouts.

11   Due to the location of the residence on a private drive that abruptly ends special agents were

12   unable to get close up pictures of the entrance to the house, whether there are any other entrances

13   to the residence or a picture of the number signs for the residence. An aerial photo of the

14   residence, new construction, and front door entrance are pictured below:

15
16
17
18
19
20
21
22
23



24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





ATTACHMENT A-2 & B-2

USAO #2020R00113- 2

**ATTACHMENT B-2**
**PROPERTY AND ITEMS TO BE SEARCHED FOR AND SEIZED**

The following items, records documents, files, or materials, in whatever form, that constitute evidence, instrumentalities, or fruits of violations of Title 26, United States Code Section 7206(1) (Filing of a False Tax Returns) for the tax years 2015 through 2019 ("the investigation period") related to Kristine Brecht (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); Aesthetic Rejuvenation Spa (ARS) (47-3018148); Adult Pediatric Medicine / Kristine Brecht M.D. (APM) (20-4211268), including the following:

1.      Evidence of the income and expenses of Brecht, ARS, and APM, as well as other Brecht-controlled businesses, specifically: Assets Rejuvenation LLC (82-3048713); Agile Business Intelligence, Inc. (82-4992004); Stem Cell Rejuvenation, Inc. (82-2777827); and Cinderella Anesthesia LLC (82-4383565). These records include internal accounting records, such as receipt books, journals, ledgers, billing records and invoices,  payroll records, cash receipts, credit card receipts, home loan applications, deeds of trust, mortgage documents, cash expenses, worksheets that accompany internal accounting, and QuickBooks or any other accounting software programs and records;

2.      Evidence of income and expense records for any of the aforementioned entities, such as bank records, bank statements, deposit slips, cancelled checks, wire transfers, other receipts showing evidence of money transfers, withdrawals, or deposits.  This can include receipts for cashier checks, money orders, financial statements, correspondence, investment accounts, accounting records, records of purchases and revenues receipted payroll records, income and informational tax returns, loan, and mortgage records;

3.      Evidence of the receipt or storage of cash; if cash is observed, it will be documented but the cash will not be seized without further order of the Court.

ATTACHMENT A-2 & B-2
USAO #2020R00113- 3

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

4. Tax preparation records, sheets, ledgers, schedules, statements, forms, summaries, correspondence, notes, organizers, receipts, and planners for the investigation period;

5. Federal Income Tax Returns, Forms, and Schedules, filed or unfiled, including Forms 1040 and accompanying schedules and worksheets; Forms 1120S and accompanying schedules and worksheets; Forms 1065 and accompanying schedules and worksheets; Forms W-2, Forms 1099, and U.S. Information Returns for the investigation period;

6. State and local tax returns as well as schedules, workpapers, documents, correspondence, and records used in the preparation of such forms for the investigation period;

7. Appointment schedule books or organizers, rolodex, client list, email lists, contacts, vendor list, telephone numbers, personnel records and/or other non-medical records/items identifying clients or vendors or employees;

8. Correspondence to and from Brecht or anyone acting upon her behalf, or on behalf of any of the aforementioned businesses regarding income, expenses, tax avoidance techniques, financial information, tax returns and information, or other non-medical business communications for the investigation period;

9. All records relating to the identity, work background, educational background, length of employment, and amounts of compensation paid to individuals employed or contracted by the subjects and the previously identified businesses during the investigation period, including personnel files, resumes, records of certifications and accreditation, records of training and licensing, and Forms 1099 or 2099-Misc relating to such individuals;

10. All records relating to work background, educational background, certifications, accreditations, diplomas, and professional training and licensing of Kristine Brecht;

ATTACHMENT A-2 & B-2

USAO #2020R00113- 4

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1         11.    All marketing materials marketing the identified businesses of the

2 subjects for the investigation period;

3         12.    All records and documents relating to the ownership, establishment,

4 and control of the premises to be searched.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ATTACHMENT A-2 & B-2

USAO #2020R00113- 5

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970